Good morning, Your Honor. Brent Plater on behalf of Northwest Ecosystem Alliance. Again, this case along with the Orchid case presents the court with this very important question, which is, what constitutes a protectable population? And you're sure it's not moot? That's what I'm certain is not moot, and I believe that the opposing counsel will agree at this time. Thank you, Your Honor. So the government's policy requires that a population, in order to be eligible for Endangered Species Act protection, be significant to its taxon. And they claim that that properly restricts this legal class of species. The Center has shown in its briefs that this particular restriction is inconsistent with the goals, the purposes, the structure, the plain language, and even the legislative history of the Endangered Species Act. And we've argued that populations should be eligible for protection if that population will advance any goal or purpose of the Endangered Species Act. It's hard to overstate the importance of this particular question to the structure of the statute. If the government's view on appeal is correct, species that cross political boundaries but have just one population remaining in the United States, whether it's grizzly bears, bald eagles, gray wolves, cactus phrygians, pygmy owls, they are no longer eligible for protection under the Endangered Species Act if they have viable populations in other countries, in Mexico, Canada, Alaska, or even foreign countries on the Pacific Rim for some marine mammals such as right whales, etc. That's because of this restriction that requires significance to be shown to the taxon as a whole. And this is a finding the Ninth Circuit has actually made in interpreting this policy in the National Home Builders Association. You're introducing a geographical concept. Is the government's position that they can look to the existence of grizzly bears in China without protecting them or in Russia across the straits there if the Alaska grizzly bear is about to be wiped out? No, the distinct population settlement policy as interpreted by the Ninth Circuit, although the policy has never been challenged by the Ninth Circuit, expressly states that significance must be assessed to the taxon as a whole, the species as a whole, wherever it may reside, and that significance to the United States alone is not enough to meet the task that is put forth in the DPS policy. Has that specific point been litigated before? That specific point in terms of... Because one on the surface would assume that we're talking about an American statute. We're talking about its impact in this country without territoriality. That's the initial threshold. That's correct. You would anticipate that, and I certainly want the legislative history and the statute itself to provide. There has been a case challenging the distinct population segment policy before. It was a district court opinion from Arizona. I just meant on the international aspect of it. I don't believe that that's been challenged by anyone at all. It hasn't really even been raised. But aren't you raising it now? You specifically mentioned Mexico and other countries not even connected by a land mass for this country. That's true. That's what will happen if this particular restriction on the DPS policy is allowed to stand, if it passes muster, and it has impacts for a wide variety of species beyond the killer whale and our largest native squirrel that's before you today. I'm trying to understand where that comes from. Are you saying it comes from the significance factor? Is that what you're arguing? Yes, Your Honor. You're saying that. Now, that's been injected by the government into its interpretation of the statute and its implementation aspect. Is that the position that the government takes, that significance means they can decide something's insignificant because the population exists external to the United States? I think that's not only the government's position, Your Honor. It's also what they've done in findings subsequent to the Home Builders Association Ninth Circuit opinion that we're discussing in the Cactus Fruginus finding. It's also what the Ninth Circuit has expressly stated is the logical consequence of this policy by requiring significance not to the United States. That simply is not enough. Why do we have to reach the international implications of migration by various kinds of fauna? All we need to worry about in this case is whether these great squirrels can get across the Columbia River without getting run over and becoming part of the roadkill. Well, Your Honor, I think, and my co-counsel in this matter, Ms. Parent, will talk to you more specifically about the findings of the 12-month finding on the gray squirrel. I'll just talk a little bit about the distinct population segment policy as a whole and the problems that it entails for imperiled species. Well, there's lots of squirrels and gray squirrels in Oregon. They shouldn't have to be exported to Washington if they need to. There are some in Oregon. There's more in California. Those may be a different type of squirrel, Your Honor. I can't say for sure. is itself impermissible because it introduces a quantification or a judgment factor that is not contemplated by the statute. Almost, Your Honor. I don't think that significance, or I think it would be better for the government to use a different word than that because significance exists in other portions of the statute. But some measure is appropriate for them to consider at that phase of the policy. After they identify a distinct population, they can look at other measures to ensure that protecting that population is consistent with the goals and purposes of the Endangered Species Act. What's happening, unfortunately, under the existing policy and the existing significance inquiry is they've narrowed the goals and purposes down to a focal point, the focal point of conserving genetic resources, according to the administrative record, and we've cited in those briefs. But the purpose of the Endangered Species Act is not simply to conserve genetic resources. It's also to conserve our nation's biological diversity for the benefit of the nation and its people. And that includes ensuring that the legislative history shows in this case that bald eagles, for example, are not relegated to Alaska and Canada, that we can have them here in Oregon. Similarly, that Washington gray squirrels are not eliminated from the state of Washington or that California condors are only left in Arizona. That's the problem with the significance policy, by narrowly determining the goals and purposes of the Endangered Species Act. Your specific concern is the language distinct and significant. Isn't that the phrase, distinct and significant, which is in a policy statement of the Fish and Wildlife Service? And your argument is that that somehow contravenes a statutory prohibition or a statutory mandate of some sort? I wasn't quite sure what the source of your argument is. Obviously, you disagree as a matter of policy. But from our standpoint, we have to apply Chevron deference, if that's the appropriate standard, or Mead or whatever. It would be very helpful if you could tie specifically into a statute where you think the service has exceeded its authority. I can do that for you, Your Honor. You can start with the definition section of the Endangered Species Act, which is found at 16 U.S.C. 1532. And if you look at the term species, it's defined at subsection 16 where it says, the term species includes any subspecies of fish or wildlife or plants and any distinct population segment of any species of vertebrate fish or wildlife. And what the Congress did at that point was restrict the number of populations that are eligible for Endangered Species Act protection by requiring that only vertebrate fish or wildlife be eligible for distinct population segment protection. Furthermore, if you look at Section 1531 of the Endangered Species Act, which contains the findings, purposes, and policy of the statute, explains clearly that the purposes of this statute are not simply to protect genetic diversity, but also that these species are of aesthetic, ecological, educational, historic, recreational, and scientific value to the nation and its people. The Supreme Court has held that every term in the Endangered Species Act needs to be interpreted broadly to ensure these purposes are advanced when the government construes the Endangered Species Act's terms. That was in TVA v. Hill and Sweet Home, similar finding. The argument is that while a population may be discrete, they cannot restrict the population's eligibility for Endangered Species Act protection to only those species that are significant to their taxon. It's that additional requirement to their taxon that is problematic because that is more narrow than the goals and purposes of the Endangered Species Act in the language of the statute. So their error is introducing, that's what I was trying to get at earlier then, is the error in injecting any significance factor or significance to taxon, and now that's your challenge. I can envision a significance type factor that would be consistent with the Endangered Species Act. This one is not, and that's the subject of my challenge. If I may, I'll reserve this. Yes, you may. Thank you. Good morning, Your Honors. My name is Stephanie Parent. I would like to try to reserve a minute or two for rebuttal as well. Well, that will be for your whole side. You have 20 minutes for your whole side. Yes, Your Honors. Your Honors, even if you accept that the DPS policy is within the authority of the agencies under the Endangered Species Act, the decision made here that the finding that the Washington populations of the western gray squirrel are not significant enough to meet the DPS policy is arbitrary and capricious, not supported by the record or the best available science found in the record. We need to keep in mind that Congress was clear in Section 4 of the ESA that these listing determinations must be made on the best available science. This is a standard that the courts have interpreted as not requiring conclusive evidence because it's preventive in nature. As the Supreme Court has stated in TVA v. Hill, because it's preventive and the protections need to be in place before these populations go extinct, this is institutionalized caution. So that overlays what happened in this case, and I want to just briefly give you a timeline because it is important to demonstrate that the final decision was arbitrary and capricious and was not relying upon the best available science in the record. The field office in Lacey, Washington, spent about six or six and a half months doing a status review of the Washington populations of the western gray squirrel. From the end of October until May 14th, and the record shows that there was a briefing to the Secretary of the Interior where the conclusion was that these Washington populations were significant and therefore qualified as a DPS. On May 16th, the last draft of the rule to go into the Federal Register concluded also that these Washington populations were a distinct population segment because they were significant. But then on May 30th, which is the date that the final finding was made, although it was not published until June 10th, on May 30th the agency concluded that it was not significant and therefore it was not listable as a DPS under the ESA. Your Honor, Judge Goodwin, there's no dispute that these populations are discrete, therefore there's no controversy over whether or not they can make it across the Columbia River. The agency disavows that as a factor. They did determine that they were discrete because of the Columbia River and separate from the Oregon populations. The only issue here is whether or not these populations meet the significant factors that are found in the DPS policy. There is no contiguous habitat between the two populations. There is not, Your Honor. They can't go and have none of the pollution. There's not any pine trees between the Columbia River and the Snake River. That's correct. So there's no controversy. The agency also found that it is discrete. So that's not what is at issue. It's whether or not those populations in Washington are significant under the DPS policy. I want to point out that these significance, the factors that are listed in the policy are intended to be indicators of significance, and the policy isn't clear, but the record shows that a population could be significant if it meets one or cumulatively even more so would be likely to be significant under the policy. How much do we have to plumb here to determine the science? Again, don't we in this kind of situation take a deferential look? We want to be sure that the agency didn't ignore the statutory requirements or ignore public notice requirements, that sort of thing. But when it gets into this ultimate decision, isn't that something that Congress delegates to the agency? Ordinarily, Your Honor, yes, but the science in this record that we have before the court is unequivocal. And the decision that was made, the final conclusion in the last weeks of the process, to reverse course and say it's not significant was not based on an interpretation of equivocal science, and it wasn't based on any countervailing science. What, in fact, happened was the agency at the highest levels in the headquarters in D.C. interpreted the science in a way that was not supported by it based on the DPS policy and a goal of using it sparingly. So if I may give you an example, one of the factors for significance is that there has to be evidence that the Washington populations differ markedly in their genetics from the populations found in Oregon and California. There was a peer-reviewed genetics analysis in the record, and that peer-reviewed genetics analysis found that there was significant genotypic differentiation. It also found, quote, significantly lower levels of genetic diversity and, quote, high degree, unquote, of differentiation between the Washington populations and the Oregon populations.  differences in genetics analysis. But the ultimate finding, the conclusion, is that all of these significant genetic differentiation between the two populations was not, quote, markedly enough to meet the policy. And what you need to look at in deciding whether they're entitled to deference, and of course we say that they are not, is the record is very, very slim, Your Honor. On page, in ER 270, the regional director in Portland said that the genetics was not compelling. The support for this was that the two populations, the Washington populations did not have a private allele. This is not a requirement of the DPS policy. They're extending the policy to make it an even higher burden to establish significance. All the policy requires is evidence of genetic differentiation. The policy does not even require that there be genetic studies done. And here we have a peer-reviewed study that shows significant differences. The other place that the agency concludes that genetics differentiation is not marked enough to be significant is ER 277 to 78. And you'll see in those two pages in the record that the goal is to use the policy sparingly. And that sparingly word, as we talked about in our briefs, comes from a congressional report. It's not found in the definition of a species in the Endangered Species Act. So they have elevated the goal of using the DPS for listing sparingly over the scientific evidence in the record that says there's a significant genetic difference. Moreover, in looking at the other explanation that's given in the final rule, which is ER page 45, the agency leapfrogs over the finding that there is genetic differentiation and that it's significant and says, well, it's uncertain as to whether or not that differentiation is caused by their isolation or caused by some other factor. This is not a requirement of the DPS policy. Moreover, the Supreme Court has said in the Motor Vehicles Manufacturing Association case that even substantial uncertainty is not a justification for the agency to not act. And when you put that rule in the context of the Endangered Species Act, which is preventive and intended to protect species and give the benefit of the doubt to the species, this kind of reasoning that we don't know the reason for the genetic differentiation is arbitrary and capricious and not supported by what the science in the record says. So therefore, Your Honors, the agencies are not entitled to any deference. With respect to the other factors, Your Honors, we've laid it out fully in our briefs why in each and every one of those, these Washington populations are demonstrated to be significantly different from the Oregon populations and should qualify under the DPS policy as a listable entity. Thank you, Counsel. You may reserve the remaining time, about a minute and ten seconds. We'll now hear from the government. Thank you, Your Honors. I would like to first address... Counsel, for the record, would you introduce yourself? Excuse me, yes. Alice Thurston, and at this particular moment, my client is the U.S. Fish and Wildlife Service. I'd like to first address, though, a document embraced by both the U.S. Fish and Wildlife Service and the National Marine Fisheries Service, which is their joint DPS policy, before I move on to its application, the second question here, to the squirrel at issue. And I'm going to go through the statutory, just for clarity of the court, the statutory source of authority for the agencies to issue this DPS policy. First off, there's no Chevron step one issue here. The ESA says the agency may list a distinct population segment at 16 U.S.C. 1532, but it is not statutorily defined and has no scientifically accepted meaning. The court found that at 340 Fed Third 842, the National Association of Homebuilding Codes. In other words, the ESA gives the agency the express delegation of interpreting an ambiguous term in the statute and does so expressly by further requiring that the secretary, quote, establish and publish in the Federal Register agency guidelines to ensure that the purposes of ESA Section 4, that's the section under which issues are listed, are achieved efficiently and effectively. That's 16 U.S.C. 1533H. So this DPS policy represents that published Federal Register guideline. It was published after notice and comment. It was published through an exhaustive co-administrative process by the two agencies. There's a separate administrative record present before the court in this case. And under me, that kind of a document, a published notice and comment binding document, deserves Chevron recognition. Counsel, would you respond specifically to Mr. Plater's citation, 16 U.S.C. 1532, and I think subsection 16, upon which he appears to rely? I'm going to return to that just a second. Well, if you can't find the specific subsection, you heard his argument. I'm sorry. You're making a statutory argument. He was making a statutory argument. I don't think his statutory argument goes as far as mine, though, in the sense that mine is the express directive to provide these guidelines and construct them. No, I understand that argument. But he was relying on a very proximate statute for his argument that there is a limit with respect to how the agency can develop a DPS policy. You have no response? No, I'm sorry. I'm blanking on what he said about that. He said the term species includes any subspecies of fish or wildlife or plant. Yes. And any distinct population segment. I'm sorry. I thought I had addressed that earlier. Yes, I'm sorry. I thought there was something more to it than that. This is the interpretation of the term distinct population segment. It's the word distinct. As I just went through, National Association of Home Builders said it's not a defined term and it has no scientific meaning. But there are some limits. There are some limits. But what I just described is that Congress, in Section 1533H, has delegated to the agencies to express them around that act. Let's take what he assumed the policy supports and see if you agree with it. That is that the agency either can or has concluded that if the grizzly bear in Alaska is facing extinction, it's not significant because there are tons of grizzly bears across the Bering Strait. In the first place, that's not an argument presented in the briefs in this case. It's a lawyer's argument, an oral argument. But it's also not true. This is not a case where the agency is compelled to look only at the worldwide status of populations. In fact, that's what Congress, a distinction that Congress made in revising the statute in 1978 from the 1973 statute, expressly made it possible for the United States to look at the status of, I mean, that's almost a red herring. I was responsible for the appeal in the wolf case, and the wolves are thriving in Alaska and Canada, but they're an endangered species in the lower 48. So the position of the government isn't that significant and can be used in such a way to rule out the geographical proximity to go to look and decide in its discretion, to which we would have to owe deference, stepping down the road here as applied, to say, well, the service has looked at it and has taken into account the fact that there are sufficient grizzly bears in Canada. Therefore, even though that they are threatened with extinction in Alaska, they have properly interpreted and put the significant taxon interpretation on the statutory language. That we owe Chevron deference to the significance to the taxon, and also, when then as applied, we have to give you the arbitrary increases. There's two rebuttals to this. First off, the argument that it should be something more than significant to the taxon is developed in a footnote number two on page 13 of their reply. Previous to that, in their opening brief, and I cite you to page 18, Appella's argument that once the service determination determined that the squirrel was a discrete population, if it was imperiled, it had to be listed. Their argument, and this is no straw man, their argument was if it's an isolated population, you must list. There's at least three places I've cited in my brief. But they're backing off of that in their rebuttal. Maybe he's backed off. He said that it's unsignificant. May I go to my second rebuttal? You may. Because it does get into the science of the matter. A population is significant to the taxon for one of four reasons. If it has persisted in an ecological setting unusual or unique to the taxon, if it represents a loss that would result in a significant gap in the range of the taxon, if it's the only surviving natural occurrence, or if it differs markedly from other populations. It also, the DPS policy also says because precise circumstances are likely to vary from case to case, it is not possible to describe prospectively all the classes of information that might bear on the biological and ecological importance of a discrete population segment. There is a broad range of reasons why a DPS may be listed. There's nothing in here that precludes listing of a distinct population segment merely because it's present in another country. I really, I'm sorry to be spending so much time on this. Well, he's raised the argument. No, I know. That's the purpose of oral arguments. Well, what's troubling is that it wasn't briefed so that we could have dismissed it in a more straightforward manner. And I'd like to go on to also discussing why significance is an important factor. Mr. Plater has said that there should be some level of significance, I believe, and that's what I think footnote two on page 13 of his reply brief also concedes. Significance to Mr. Plater is something that should be different from significance at the taxon. But if you look at the dictionary definition, significance can contain a broad range, I mean distinction can contain a broad range of significance, including notable. And I'd like to point out that what we're talking about here is the importance of species or DPS to their genetic cohort. And their subspecies or species or taxon as a matter of not just whether they're in a little pocket car and no other squirrel can get to them, as Congress said was a problem, or because they're somehow an alien species that have been introduced and are thriving in an area that's not right for them and they're causing problems. This is a critical congressional finding here, and I'm going to go to that legislative history that Ms. Parent cited. If you look in excerpts of record, volume two, at page 368, you see here Congress is addressing a GAO report, which was urging Congress to strike that very language, distinct population segment, from the statute, from the ESA. And 367, the GAO makes the contention that using the term DPS to include any population of the animal, regardless of its size, location, or total numbers, according to the GAO, this could result in the listing of squirrels in a specific city park, even though there's an abundance of squirrels in other parks in the same city or elsewhere in the country. Congress rejected this, relying and delegating to the agency the authority to make sensible judgments and use this distinct population segment policy sparingly. And I'd like to point out that that is expressly in keeping with the statutory language at 1533H, which says that the guidelines for effectuating the listing determinations should be used efficiently and effectively. Those are terms of discrimination, not necessarily terms of broad inclusiveness. And finally, on page 368, again, of the record, Congress points out that evidence is a tricky matter here. Congress says, similarly, listing of populations may be necessary where the preponderance of evidence indicates that a species faces a widespread threat, but conclusive data is available with regard to only certain populations. So what the court is doing is – excuse me, what Congress is doing here is pointing out that it is possible for there to be evidence that indicates that a species as a whole should be listed, but the only conclusive data – and I emphasize the word conclusive for an important reason, because I do think that Congress realized that you have to have strong data to list populations. And that's in the committee report on this particular section. Before I move on to the actual application to squirrels, I'd like to urge the court to focus on the Maine v. Norton decision, the district court case at 257 Fred's subsecond, and specifically jump site page 388, where they discuss the significance factor. This is a very lengthy and well-reasoned decision reviewing the whole history of the DPS policy, how both agencies developed it, and it gets into the importance of the significant biological overlay over the geographic overlay that is represented by the discreteness factor. The importance of a population segment existing in an unusual or unique ecological setting is well-established. Such a population segment is potentially an indication of local adaptations and host generic diversity. Protecting a population segment where failing to do so would result in a significant gap also gives effect to the significance criterion by preserving opportunities for gene flow and demographic stability. The last consideration gives effect to the fundamental concern underlying significance by conserving genetic resources, and the court affirms the DPS policy on these bases. It's totally consonant with Congress' goal of preserving our most imperiled species and not preserving every population that just happens to be isolated. With respect to the application of squirrels, I'd like to address some of the points that Ms. Parent raised. I think if you look at the record, I'm going directly to the genetic question here, you'll see that the issue of divergence between the squirrels in Oregon and Washington and elsewhere was considered important, but as Mr. Warheit said, Dr. Warheit said, this study requires additional analyses for at least three reasons. First, sample sizes need to be increased. Second, the overall genetic diversity is low and a greater number of data points will provide us with a broader survey. Third, we need to obtain control region sequences. In other words, it is true that none of the alleles that is found in this particular population of squirrels is not also present. I'm saying too many double negatives. It's true that every allele found in this population of squirrels is also found elsewhere, and Mr. Warheit, who is the one who emphasized the genetic distinctions elsewhere, says that there should be more study in this respect. Now, he said that in what part of the phase of the consideration, the draft? He wrote it in a 2003 document, and it is quoted extensively. I should have said the center. I'm sorry. At 68 Federal Register 34638, which is the final notice. Okay. Was that finding or statement made before or after the draft, which was reversed by the final? The draft to which Ms. Parent referred was the draft provided by the field study team. That's what she said. Yes. It was not the draft that was provided by the regional director. It was the regional director in this area actually made the recommendation that this was a not warranted decision. So it's not a question of Washington ruling the region. There was a regional application of that, too, and we have that in our brief. To answer your specific question, his study was done in 2003, and that Federal Registry. But that was done before the regional override. Yes. I'm pretty sure it was, although I'd have to go back. The regional director had that in front of him. Correct. And the regional director doesn't take any direction from Washington? I am unable to speak to that interaction. Well, you said this isn't a question of Washington ruling the region. Well, the implication was that the final recommendation that was sent to Washington was a yes and it was turned down in Washington. But I want to point out that the regional director is also a biologist, as are the directors in Washington. So it's not purely a matter. I mean, I find the chain of events needs to be clarified a little bit here. I also want to point out that the behavioral attributes study, these are just examples in response to some of these parents' examples. For example, the shy behavior is emphasized as something that is quite unusual for this squirrel. But all of the information in the record on shy behavior was anecdotal, and there were no comparative studies. So the agency was not without reason to say that this was not indicative of some unusual change in this particular squirrel. Well, you know, it's interesting because in the bitterroot case we heard earlier this morning, the argument of the plaintiffs in that case was that the science being relied on by the government was anecdotal because they just got out and put boots on the ground and made a visual inspection, but no science. Now, on your argument, you're saying, well, that's not good enough science if it was just anecdotal. So what does anecdotal mean? In this instance, and I'm not speaking for the bitterroot case because I think that's a different sort of science, but what we're trying to do is determine the significance of a species to its larger component. You're saying that the evidence was anecdotal. As applied to this case, what and how much anecdotal evidence was there? I cannot quantify it, but the type of evidence it was was people passing through an area saying things like, well, there are lots of squirrels here. We see their nests, but we rarely see them. That's one of the quotes in the book. There's no comparative study of the shyness of squirrels here versus the shyness of the same species in California where they are hunted, in fact. They're fairly common there. So what you're saying, there would have needed to be a controlled study to make a comparative analysis. I'm saying that the agency in this instance found that the anecdotal information regarding shyness was not scientifically proven up to the point where it could be relied upon to show that it was a significant distinction for the purposes of significance to the taxon. I would go to the discreteness question, though, and say that even though we don't disagree that the populations are discrete in this case, we also – the agencies, the DPS policy does not require absolute untouchable segregation or isolation of a population for it to be considered discrete. If crossing a bridge was the only way a population could reach an area, it might well be considered discrete nonetheless. Finally, going to habitat variation, there's a lot of different discussion in these briefs about how the squirrel is dependent upon various pine trees and oak trees, but I'd like to point out that the habitat varies widely throughout the population ranges. That's at 68 Federal Register 34636, that the squirrel is not dependent on pine trees. It also eats oak and maple-produced mass. Those are usually in different regions, aren't they, in different habitat areas? It's my impression from the record that the squirrel's diet varies with its habitat. Would their DNA also vary with the habitat? I don't think that's been conclusively shown, no, sir. I guess there's no dispute in this case. There is some difference in the genetic studies of the two different areas, different regions. There is some difference, but it's not deemed significant because the genetic diversity is replicated elsewhere. In other words, the alleles that are present in the Washington population are also present elsewhere in the population. Can I just bring it back to the little debate that started this, and I know this will be your last question. No, that's all right. I'll try and make it focus. You talked about the congressional report saying you don't want to have, because the gray squirrels are not in a part when they're across the city, in another part. That's what Congress was concerned about. Now we have a situation where, at least in the draft, the geographical isolation was a factor because it couldn't get across, as we've been discussing, the Columbia River. Is it the government's position that that geographical separation is not significant then? No. Significance and geographical separation are separate components of the definition of distinction in the DPS policy. So the geographical separation was found and was considered as indicative of the existence of the DPS policy. I hesitate to apply the term significant yet again because I think it would be confusing it with the significance factor. It's a subset of significance. It's part of the factor, isn't it, that sort of looks at it? The geographical component is one of the four or five factors, I mean. In a different manner. The discreteness factor has to do with the relative isolation. So that's the geographic factor in terms of being isolated. The significance factor has to do with whether it's persisted in an unusual or unique ecological setting or its loss would cause a gap. This has to go to the impact of the loss of the DPS on the taxon. So what you're looking at is, is it in fact isolated? And that's the discreteness factor. And the significance factor is what would it mean? What does this particular DPS mean to the taxon? Thank you, counsel. Your time has expired. We will hear from Ms. Parent. You have reserved some time for your side. Your Honor, Ms. Thurston has really relied upon a conclusive evidence test. And the ESA clearly states that it is the best available science. With respect to her citations to Dr. Warheit in the record, on ER page 44, they quote Dr. Warheit extensively. And there he says, there is significant genetic differentiation among the three Washington populations and as compared to the Oregon populations. On the next page, ER 45, the agency says, the preliminary information from Warheit suggests that there is genetic differentiation between these populations. It's only when they look at divining the reasons for this differentiation, does the agency say, well, it's uncertain, and therefore we're saying it's not marked enough. Moreover, the policy, the DPS policy itself says at ER page 397, that the goal is not simply to preserve genetic resources. The goal is also to preserve natural systems and the biodiversity over a representative portion of its historic range. We're talking about losing all of the populations in the entire state of Washington. The western gray squirrel only exists in Washington, Oregon, and a little bit of northern California. We're not talking about a city park. When you apply the policy in the plain language of the Endangered Species Act, it's clear that the record shows that the science supports a finding of significance, both on the portion of the range that's going to be lost, the genetic studies that have been done, and again, no countervailing evidence as to that factor, as well as its different behavior, different size, and different number of nest sites. And finally, your honors, the DPS policy is not entitled to Chevron deference. Congress gave two places where the agency had authority under 4B4. There they have the authority to promulgate regulations and rules. Under 4H, they have the authority to adopt guidelines. The agency here chose to exercise its authority under 4H, not 4B4. Therefore, these are not regulations, and even the cases cited by the government demonstrate that this is not a regulation entitled to Chevron deference. At most, it's entitled to Skidmore. It has to be persuasive. Thank you, counsel. The case just argued will be submitted for decision.
judges: Goodwin, O'scannlain, Fisher